Good morning, may it please the court. My name is Jack Fitzgerald and I represent appellant Robert Reid. To give this case a little bit of context, I'd like to start by noting that seven months ago on November 8th, the FDA released a tentative decision to revoke the generally recognized as safe status of artificial trans fat, meaning effectively it would ban trans fat in food. And it did that in part because there's no longer a scientific consensus that trans fat is safe at any level. And in fact, for the last 10 years in various federal registers, the FDA has been saying that there's no level of trans fat, the consumption of which below the consumption of which is I'm sorry, why is this relevant? Yeah, what does this mean? So this is a product, a spread. You're trying to bias us, is that what it means? What does context mean? I don't understand. We deal with the record as it existed at the time. Yes. The district court made its ruling and you want to say things have changed now and I'm having trouble understanding what this change, how that bears on the district court's ruling, any rulings of law, exercise of discretion, facts that were then yet in the future. I understand, Your Honor. In this case, we allege that. I don't want you to understand. I want you to answer. Why are you telling us this? In this case, we allege that the consumption of artificial trans fat at the levels that are present in this product. Now I'm hearing exactly what you were talking about. I am too. It's not you. Yeah, it's a microphone. It's not you we're talking about. So in this case, our allegations were that this product contains artificial trans fat and it advertises itself as proven to... We know what the allegations are. And basically, the FDA, for the last 10 years, has been saying, has been agreeing with us and it just culminated in that, and that was the reason. Do you understand the question? I do. So why don't you answer the question? You have now spent almost three minutes... Filibustering. Filibustering. The question is, why are you telling us this fact? What bearing does a fact that happened after the district court issued its ruling have on what we are supposed to do here today? The only reason is because it satisfies or it demonstrates that what we were alleging in the complaint as far as the danger of artificial trans fat was true. It depends whether you, you know, I don't understand. What bearing does that have on our review of the district court's order? What does that have to do with preemptions? It doesn't have any bearing on the case, and I apologize for wasting... Okay, so you just wasted three minutes of your own time and our time. And you damaged your credibility. I'll move... You made yourself look like a fool. But go ahead. I apologize for that. I'll move on to the issues of preemption. Of course, preemption is... So you dug yourself a nice little hole. You're going to try to start to get out of it, okay? I'll try to do that, Your Honor. So there's four main statements which the district court found were preempted in this case. The first one is the phytosterol health claim. Now, in 2000, the FDA approved a health claim under an interim final rule, which has the effect of making law of being a final rule until such a time as a final rule is promulgated. And in the 14-year stance up to this date, they still haven't promulgated the final rule. So this interim final rule is the rule, is the applicable law in this case. Now, Johnson & Johnson on this product, McNeil, its subsidiary, says something different than what's in that interim final rule. Now, they say that they're allowed to say that because in 2003, the FDA issued a letter to Cargill saying that it would consider exercising enforcement discretion not to enforce that law for products that make other claims for lesser amounts and have some... Do you agree that if Benecol's label stated zero grams of trans fat, preemption would preclude Reed from challenging that claim? If it stated zero grams of trans fat rather than no trans fat, and it didn't, it wasn't... So zero grams of trans fat preempted. That's it. Why is no trans fat different? So no trans fat is different. The regulations say it's different. So the regulations say that no trans fat characterizes the level of trans fat in the product as opposed to merely conveying a factual statement about the amount. The regulation is 21 CFR 101.13 I3. And this is evidenced by the FDA's letter to Best Life, which is in the record, where they said that you're not allowed to say no trans fat, but you can say zero grams trans fat. And basically what the regulations recognize is that, or at least they assume, is that consumers are familiar with the per serving rules in the nutrition facts box. So it's actually not the case that this product has zero grams or no trans fat. That's false. It does have what the FDA allows you to express as zero grams trans fat per serving because it has less than 0.5 grams per serving. But overall, it doesn't have no trans fat in it. That's a false statement. And as the FDA has said in that letter, you're simply not allowed to say no trans fat. That characterizes the level of the trans fat in the product. Now, the FDA has allowed statements such as cholesterol-free, no cholesterol, for other fats, for cholesterol, for saturated fat, for total fat. But it made a decision that for trans fat it wasn't going to permit this type of characterizing language because of the scientific consensus that artificial fat is so harmful. There could be no established no daily or recommended daily level of consumption for it. And that's why that doesn't exist. And I think, you know, the FDA's letter, if it's not clear from the regulations itself, which I think it is. I'm sorry. When was the letter issued? I'm sorry? When was the letter issued? The letter was issued in February of 2008, February 4, 2008. This would have been before the lawsuit was filed. Right. Okay. Yeah. Where is the letter on the record? It's pages ER 151 through 152. And the second thing that makes this no trans fat statement against the regulations and misbranded here is that it's in a seal with a heart. It contains a heart. Now, under section 101.14a, a health claim or an applied health claim is anything that, including for the use of symbols like a heart, it says it right in the definition, implies that there's a health component because of the level of a substance in a food. So what you see McNeil is doing here is they put this heart in juxtaposition with the no trans fat, suggesting that the product is heart healthy because it has no trans fat. Of course, that's false. It has trans fat, and it's not heart healthy. Well, so didn't the Third Circuit in a pretty identical case find these claims preempted? The Third Circuit did, and it was in an unpublished decision. I would suggest, you know, that was a copycat case of this case, so-called copycat case. And I don't believe that the plaintiff there and the appellants made, you know, the proper arguments and really gave a deep analysis of the regulations, including didn't submit these FDA letters, which give context to this and substantiate, you know, our interpretation of the regulations. Now, going back to the final sterile health claim, McNeil claims it can use a different claim than what's provided for in the regulation because of this cargo. Now, one thing I'd point out is California has the Sherman Law, which incorporates all FDA regulations. So as soon as the FDA passed this intrafinal rule permitting this health claim under Section 101.83, that also became California law. Well, but aren't the stanil esters-based health claims, weren't they authorized by the 2003 letter by the FDA? Isn't that a different-I mean, we don't have to treat them all the same. Is that correct? I wouldn't characterize the letter- And then it would be preemptive if we find that. I wouldn't characterize the letter as authorizing the claims. What the letter said is that we may, and in fact it said we will, we intend to consider whether we're going to exercise enforcement discretion to enforce the law against foods that use a different claim. Okay. So it uses tentative language, but it appears to be the product of an ongoing agency process involving notice, comment, and analysis of new scientific evidence. So wouldn't-isn't that a strong argument for its preemptive effect? No, I don't think the letter has preemptive effect under Feldner and Hulk. This letter was issued in response to a request from Cargill, which is a food manufacturer. It was issued 39 days later. So the FDA didn't, as far as answering this letter and the request in the letter, didn't do a notice and comment or anything like that. Well, let me ask you this then, all right, since I'm not-you're not going to concede anything. I concede that. But if you look at the two, if you divide your claims into two natures, is one-is the preemption evidence stronger on one than the other? Not really. I think it's strong on both that they're not preempted. You know, one thing I want to point out is even if you accept that the Cargill letter could have preemptive force, and we certainly don't concede that. We don't think that's right at all. But even if arguendo it could, one of the requirements for its enforcement discretion was that these products still have what's called the minimum contribution requirement, which requires that there's a list of substances set out in 101.14, like five or seven substances, and it has to have at least 10 percent of the daily value of one of those substances without adding it. It has to naturally have it. This product has never met the minimum contribution requirement. So even if the Cargill letter could excuse its noncompliance with the interim final rule, it still didn't meet the requirements of the Cargill letter. And we pointed that out in our brief. So far- So was this pending for, like, 14 months, this case, before the court finally ruled on this? What was going on there? I assume-I know the Southern District is a very busy court. You know, it's got a lot of criminal actions and- But it was, like, 14 months between when you argued it and when you heard? There was no argument. It was submitted on the papers. Okay. So it was just, it was 14 months after, I believe after the motion was filed. In any event, we don't think that the Cargill letter has the-remember, only law- I'm sorry. I just want to make sure I understand your answer. So your position is this does not comply with the Cargill letter. So whatever the effect of the Cargill letter, they don't fall within it. That's correct. I'm not trying to put words in your mouth. I'm just trying to understand the argument. You may continue. I just- Absolutely. And I think one of the things is we've never seen McNeil respond to that. We raised that, you know, down at the district court. I bet you they will do so. I would be interested to hear what their response is. I believe- You better get your pen ready because I'm going to ask them the question. I'll do that. Moving on to- You know, if you-I don't want to break the flow of your argument, but you refer us to this 2008 letter, which is at ER-151. Can you be a little more specific as to where in the letter? It is so tiny. It is. I know counsel don't care a whit about readability of these things in the excerpts of record, but it might be worth some time just flipping through them before you file them and see, gee, is there anything we can do to make them actually legible? Sure. Well, this comes directly from the FDA's website. So on page 152- You know, you say that as if that were an excuse or that were a reason. That is a mere fact. But I bet you you or somebody in your office knows how to make this legible, even though it comes from the website, right? You probably have somebody who knows how to enlarge, right? That's right. Okay, so why tell me that fact? That's advice in the future. There we go. So tell me, if I squint really hard, give me a paragraph number or something. On page 152, paragraph 9, it states, The label for your Sammy's Best non-dairy coffee creamer product bears an unauthorized nutrient content claim, no trans fat, which has not been defined by FDA. We note that you may make a truthful statement on a product's label that specifies the amount of trans fat per serving, which would be that zero grams trans fat statement. That was the one that was held as preempted in Carrera versus dryers. But this is a different statement. So this is directed to some other manufacturer? That's right. And what effect does this have? I'm not quite sure. Well, I think you only need to. Is it sort of like a private tax ruling? Does this become published? The effect is that it's persuasive analysis on the interpretation of the regulations under Chevron. This is on the website? You said this is on the FDA website? That's right. The FDA makes public these warning letters. It's part of its enforcement process. And courts regularly rely on these enforcement letters to make, you know, to understand what the regulations are. Now, I don't think you need this letter. I think you can just rely on the regulations. You're just talking about it because you want to waste more time. Well, no, it's not that. It's just that there's a debate between the parties about how to interpret the regulations. I just want to understand your argument. Was that part of your motion for judicial notice? Yes, it is. And that was denied down below, right? That's right. All right. But you're asking us to look at that. That's right. And I think that this is entitled to Chevron deference on the interpretation of the statute. Because, you know, the argument that McNeil is making is that no is a synonym for zero in a vacuum. And so if we can say zero grams, why can't we say no trans fat? And, you know, there's some appeal to that argument, some logical appeal to that argument. But the regulations make a distinction between that. And you're not allowed to say no trans fat. And that's what the FDA has said here, interpreting its own regulations. That's entitled to Chevron deference. Okay. And I think it's persuasive in this condition. Go back to what you were saying. I just want to make sure I understood what and where and I've got it. So that's going to be my second question. So the other two statements that we challenge that were dismissed as preempted are the proven to reduce cholesterol statement and the harping it. Now, in the proven to reduce cholesterol, there's really two regulations from which such a statement might be made. Now, we point out that in 101.83, which provides the phytosterol health claim under 101.83D, it allows optional information that permits the manufacturer to make a statement about the link between the substance, the method of the substance and the prevention of disease. And in this case, it says, may state that the link is through blood total cholesterol or LDL cholesterol. Now, rather than saying that as part of the claim, McNeil separates it from the claim, gives it prominence, and suggests that it's about Benecol itself rather than the substance of Benecol, the phytosterol. So we believe that it violates that regulation. And, again, we've got an FDA letter that we think substantiates that under the Chevron deference theory. Okay. So just so that I understand this. I mean, obviously, the claims that were authorized are preempted, just in a context. And so you're claiming in terms of where they haven't authorized them because the science is developing, then you get to litigate them, right? And there could be a time where the science does become more developed, and then they could authorize, and then they would be preempted, right? But you're claiming to be in a window. Well, not really, because these aren't claims that just are being developed. These claims are actually not authorized. They're unauthorized by the regulations. Now, what is being developed by the FDA? But if they were authorized in the future, then they would be preempted. Well, I guess you could say that about any claim on any food. You know, sometime in the future, the FDA may allow you to say, you know, it cures cancer. But, you know, if there's no, I mean. But in the interim, when something is unauthorized or not authorized, you get to do something. Yes, absolutely. Under the UCL's unlawful prong. And if that happens to be false or misleading, the fact that the state would be disallowing the manufacturer to use that claim because it's false or misleading wouldn't violate the express preemption clause of the NLEA, because it would be imposing the same requirement on the manufacturer as the federal law does. So there's not a class at this point, though, here. You never got to that stage, right? No, this was just a dismissal, yeah. And I see I'm down to about two and a half minutes. If I might reserve my time. Okay, sir. You may reserve it. We'll hear from opposing counsel. Good morning, Your Honors. Good morning. I am, may it please the Court, I am Matthew Kaplan from Tucker Ellis, representing the Defendant Appellees Johnson and Johnson and McNeil. I'm going to start with some questions just because I need some answers. Sure. So unlike the statements such as no fat and no saturated fat, the FDA explicitly decided not to authorize trans fat-free claims of the type that McNeil makes on the Benetol label. So given that the FDA intentionally decided not to act in this case, how does preemption apply to the no trans fat claim? Okay, the no trans fat claims are the nutrient content claims, and it applies because I don't think that the FDA chose not to stand down. In fact, in 1993, they issued another rulemaking to investigate the trans fat issues, which is ongoing and, as counsel brought up, is still ongoing with investigations of trans fat. What FDA did was authorize in Section 101.9 a rounding rule requiring it to say 0.0 and authorized a rule under 101.13.B4, which explicitly allows the use of synonymous terms. And 0.0 and no are synonymous terms. What do you make about this document, this letter at ER 151 and 152? I think that it's a letter that the FDA issued. Counsel argues that Chevron deference applies to that letter and all the letters they've submitted. Chevron deference does not apply to any of these. It only applies to statutes and enacted formal regulations that interpret statutes. This letter is an informal advisory opinion that the FDA has taken the position repeatedly is an informal non-enforcement action, and two years ago. So do you have a case that says that it can apply to that letter, or is that just your opinion? No, I do have, and it doesn't apply to that letter because, first of all, Chevron requires a regulatory interpretation of a statute. Secondly, this Court's Biotics Research Corp. v. Hecker case talks about a plaintiff did not respond to it being a non-enforcement letter. Two years ago, in Price v. Steadman, my service, this Court, en banc, said in order for letters to get deference, they have to be a letter that would impact other third parties' rights and were intended to carry the force of law. Under the FDA's regulatory procedures manuals, which were submitted to the Court, they say this is not a formal agency position. The FDA argued it was in Candler's case to the U.S. Supreme Court in their brief against Cerciorari that, and explained, enforcement letters are pre-enforcement advisory opinions, and when you read the letter in the second to last paragraph, it actually invites the recipient. And how is it different from the Cargill letter? It's very different from the Cargill letter. And the reason it's different from the Cargill letter is that the Cargill letter was issued in a regulatory proceeding. In 2000, the interim final rule came out. Public comments were submitted on the Cargill letter, and it's a FDA letter of enforcement discretion. And it says that it was in response to comments on the rule that was evolving on advanced amnestors, and that it was published and discussed in the Federal Register on subsequent occasions when the proposed final rule came out, and two additional times when the FDA has talked about and asked public comment about exercising enforcement discretion under that letter. In addition, the FDA indicates both in the letter itself and on its guidance for industry, which is available and published to all industry, that when it issues letters of enforcement discretion, they are special letters. They're not warning letters. And those are to notify the entire industry as to the regulations and rules that the FDA is going to enforce. And it says in the enforcement discretion guideline, all other manufacturers know what the FDA expects them to do. So this has a formal procedure. And yet they put this on their website. Well, sure. If it's just a private warning to a party, you would expect them to keep it private. They put it on their website. They obviously intend the public to read and be informed by it. Well, yeah, it seems like you're arguing the standard that's applicable to whether such pronouncements have preemptive effect. In contrast, you know, we have deferred to agency interpretations of their own regulations in informal documents many times. And under that standard, why wouldn't we have to defer to the FDA's interpretation and warning letters that no trans fat is an unauthorized claim under its regulations? I mean, they're not doing it for litigation purposes or anything. It's not like they're weighing in here because they're being sued or something. Actually, it's even less informal than that because this is before litigation. This is a letter that's a warning to an individual. And under the Price v. Stabadourian case, it wasn't a preemption or force of law case. It was a question about the level of deference to be given. And it was applying United States v. Meade out of the Supreme Court, which held that you have to have some formality. And the two cases that both parties briefed a lot were the Fellner case and the Holt case under the Third Circuit. And they talked about formality of process and indication that it is the agency's interpretation, not an individual employee's. And the FDA explains this is an individual employee. And if you look at the letter, Your Honors, it doesn't do analysis. It just makes an allegation that this is no trans fat. It doesn't talk about the regulations. It doesn't have the benefit of the response that received. And it's publicly posted on the website, Your Honor, because it's the government. And it's an open government. It is notifying what they are doing. But it's not undisputed what it is. So I don't know why we can't take judicial notice of it. Well, we've all looked at it anyway, so in tiny print. Well, I think there's two issues on the judicial notice. The first was whether the district court was correct. And I think they were correct. It's an abuse of discretion. The question as to whether this court can take notice of it is Your Honors can look at it. You can certainly consider it. It begs the question of what deference does it do. And under the United States v. Meade, under this court's Price v. Stavangering, under Biotics, it's entitled to very little deference because it doesn't have analysis. It wasn't the response of other counsel. And it conflicts with, importantly, it conflicts with and doesn't address the regulation which authorizes the use of synonymous terms. Well, let me ask you this. You haven't said this, and so I'm assuming. It seemed to me that the district court was clearly wrong about them not having standing. You haven't really said much about that. I just don't. It seems to me they've pled enough to have standing here. Well, I don't believe they have. And they haven't pled enough to have standing, because to have standing, you have to have an injury in fact that leads to you. Well, they said they wouldn't have bought it. But for the misrepresentations, and there's case law to support that, so it. Well, not on these facts. And the reason is you have to have causation or reliance, and the but for is related to the misrepresentation that you claim harmed you. So you have to have a promise of something, and then you pay for it, and then you have to say what I was promised did not occur. And they haven't pled. Or you said I wouldn't have bought it at all. Well. Never mind what I got, what I paid for. If you had told the truth, I would have not gone for that deal. Well, it's not that simple, because it's not a question. That's the point. It's not untruthful until they show that it is untruthful. They have to plead how it's untruthful. It depends on the promise that is made. And that's like the Kwikset case, which I believe Your Honor is referring to. In that specific case, it was pled that a lock was made in the United States. And they said it was not made in the United States. It was a misrepresentation because they pled the fact that the lock was not made in the United States. Plaintiff Reed here identifies the promises that led him to buy this product. And he says the promises were that it would reduce my cholesterol, that it would not make me sick, that it would not be harmful to me. And he doesn't plead any facts to say that his cholesterol did not go down, that it made him sick, and that he was harmed. I sort of feel like we're talking different languages. And, you know, we say stuff, and you answer with something that's completely irrelevant. So I'm going to ask one more time, and then if you're not going to answer it, we will go on to something else. They say we don't care whether we got what we paid for. The point is we would not have bought if you had just told the truth. We would have walked away from the deal. So we don't have to allege, you know, we may have gotten a better deal than we thought. We might have gotten great benefits. We might have won the lottery. It doesn't matter. The point is we would not have entered this deal. We would not have paid you any money or this much money if you just told the truth. Okay? So it stops right there. It stops at the point of transaction. Consequences don't matter. Address that point, not any of this other stuff. Well, I think it is the same point because it's not untruthful. Just be careful because I'm not going to give you another chance. It is not untruthful at the point that you just exchange money. You have to plead that it is untruthful. If you walk into the grocery store and you give the cashier the whatever it is, $3 or whatever, for the product, that product hasn't caused you harm, and you have to lose money or property. You have to. That's under the business and professions. I don't think you heard or you don't want to answer, so we'll go on to something else. Well, the — Their claim is I would not have bought. Whether it's truthful or not, if you just told us these other things that you should have told us, we would not have bought. Well, did your client get any money for the transaction? Ultimately, not directly, but ultimately as the manufacturer. Yeah, there we go. So this is their claim. Their claim is if you had just told the truth, you wouldn't have gotten my money. So we were injured by paying money that we would not have paid if you had just told the truth. I don't know how you can get around that, and I think you're burning up a lot of your time with smoke and mirrors. Well, I think that's inconsistent with Proposition 64, which put the heightened pleading standard on this and the heightened requirement that you had to lose money and it had to be caused by this unlawful conduct. Right. We lost money. We walked in. We paid money. If you had just told the truth, we wouldn't have paid the money. We would have gone and bought something else. So short of a heart attack or something like that, there's no standing? No. It depends on the representation that's here. If they can just walk through the grocery store and take every single product and say this one's unlawful, this one's unlawful, it completely subverts the reliance and causation elements. Well, they bought. They're not just going through and saying this is unlawful, this is unlawful. These are things they actually bought. Well, they haven't identified, and here's maybe the problem, is they haven't identified the unlawful statements. The nutrient content claims dealing with trans fat. Well, they say no trans fat. That's a fraudulent statement. Now, you disagree substantively, so let's not, let's, we can leave that for another discussion. Say, look, you say no trans fat. I went and bought it thinking no trans fat. If you just said what you're supposed to say, we wouldn't have bought. Well, his pleading. We would not have bought it at this price. We would not have taken the risk that it might harm us. I think this is the disconnect between us, and that's because what is his pleading? We have to take his pleading as true. We have to stand in the shoes of his pleading. And what he alleges is that he saw, he understood, and he relied on this entire label. And under this circuit's authority, Freeman v. Time, we have to look at that entire label. And that label tells him. I'm sorry. This is for purposes of standing? Well, the issue. We're on standing, remember? This is injury in fact. Standing. Standing. You know, we're not adjudicating whether he, I mean, he might in fact lose on every one of his claims. But we have to, for standing purposes, we have to accept his allegations as true. Right. And he alleged that he knew the product had trans fats in it. So he couldn't have been misled by a statement that there was no trans fat in it because he says, I knew there were trans fat in it when I looked at the label. So he doesn't have standing. That's your answer. That is my answer. And you're sticking by it. Yes. Okay. Now, are you paraphrasing what he says in the complaint when he says, I knew there was trans fat in it when I bought it? What he actually says is, I saw, understood, and relied on the entire label. That's in paragraph 128 of his complaint. All right. Where does it say, I knew there was trans fat in it when I bought it? Well, if he saw and understood and relied on the entire label, the label says there's trans fat in the product. So there's a diet tip that explains that it has partially hydrogenated vegetable oils, that it has trans fat, and why it says 0.0. Does it say on there that hydrogenated is trans fat? That's on some other thing, isn't it? No, it's on the label. ER 56. I'm sorry? ER 56. I got the label. Okay. Again, it's not designed to be read by human beings, human eyes, but I suppose lawyers don't think about stuff like that. It is in this diet tip on the lower right-hand corner where, how can Benicol spreads have 0 grams trans fat if they contain partially hydrogenated oils? And then there's a three-sentence explanation of that. Well, read it to me. Read it. Yeah. Oh, sure. A small amount of partially... Because I sure as heck can't read it. A small amount of partially hydrogenated oils are used in Benicol spreads to maintain a semi-solid structure and to enhance the melting characteristics of the Benicol regular spread. As a result, Benicol spreads contain an extremely low level of trans fat. The FDA allows foods containing less than half a gram of trans fats per serving to be labeled 0 grams trans fat since this is considered an insignificant amount. And he says he saw and understood that statement. Okay. And where does it say that means no trans fats? It says this is why we can label it as having 0 grams trans fat. Correct. And does the fact say 0 grams trans fat? Yes, it does. In the nutrition facts box, which is upside down. Okay. So that explains why you have 0 there. Correct. How does it explain no trans fats? Well, it doesn't need to explain trans fats. I thought the court's question was how does it disclose that trans fats are present? The reason they're allowed to say no trans fats is because of the rule for synonyms, which is in 101.13. I see. So they need the label, which is illegible or difficult to read, plus the regulations, which are absent and difficult to read. Well, there's no requirement that food labels explain the regulatory basis of every statement on the label. Okay. I see your point. He said in his complaint, I read the entire label. Your point is there it is, way down there. It says there's a little teeny bit of trans fat in there. And that goes through standing. Yeah, that goes to standing. It does go to standing. It's not just way down there. These are shrunken labels from what they actually are when you purchase the product. Oh, you made it small just for our benefit. I didn't file the complaint, Your Honor. It was my esteemed counsel who's providing the small copies. You didn't provide a large copy, did you? I did not provide a larger copy, Your Honor. But it may be in the briefing. I don't recall. Well, here's something that I didn't see addressed in your briefs, and I want to ask you. Reid contends that Benicol does not comply with the terms of the 2003 FDA letter because it fails to provide 10% or more of the daily reference value for vitamin A prior to any nutrient addition. You didn't address that in your briefs. Do you have a response to that? I do have a response to that, and my response is as follows. We move to dismiss the entire complaint, and the district court granted the motion. It is incumbent upon Mr. Reid to raise his arguments to the district court for this court to evaluate whether the district court got it wrong. This was not an argument raised below, so he has waived that argument. Secondly, these claims are still subject to the primary jurisdiction. I want to remind the court you can affirm on any basis that's in the record. This is de novo review. The primary jurisdiction doctrine applies regardless of the vitamin A issue because the FDA, under their consideration now and the rule that they submitted with the Federal Register, is evaluating both the level of trans fats that should be, not trans fats, the level of phytosterols that should be in a product in order to make a health claim, what the health claim should say, whether or not you need to continue to have a disqualifying vitamin A rule, and whether or not any level of trans fats should disqualify the issue. I'm actually going to defend my opponent here because the trans fat rule that he brought up that the FDA filed this fall saying that they're looking at eliminating partially hydrogenated vegetable oils is yet another reason. And the FDA is currently considering these complex questions and ongoing rulemaking that is subject to public comment. Under Syntec versus Semiconductor from this court, and under the court's Clark versus Time Warner cable, this is what primary jurisdiction is about. And I want to add something that's happened subsequent to the briefing on primary jurisdiction. Are you going to go off and do what he did, too, and waste your time with stuff that happened after the district court ruled? Well, what I want to let the court know is that the Northern District has been applying the primary jurisdiction to FDA consideration of guidance for industry that is being published in two recent cases. Are these cases that you... No, they happened just this year, 2014, because the FDA published a guidance... You're not even going to let me finish my question. I'm sorry. You're not even going to let me finish my question. So you're going to say something that's irrelevant. Did you file a letter with supplements and citations? We did not, Your Honor. Okay. And I take it these were decided yesterday? Well, they were decided in the spring of 2014, yes. I see. Weeks ago? Months ago? I don't have the exact date. But you could have filed something, right? Did you bring them to opposing counsel's attention? I did not, Your Honor. Okay. So you're going to stand here now and bring to our attention something that you've neither provided to us so we can examine it before argument and ask you meaningful questions about, nor that opposing counsel can give us a response to because he doesn't know you're going to spring it on him, right? And is there some other way you want to lose your credibility with us? Is there some reason you haven't done that? You prepared this morning, and for today you were going to cite these things, and you chose not to give advance notice to the court or opposing counsel? Was it just something that you sort of thought you'd sneak by? There was no attempt to sneak anything by, Your Honor. It looked like it. Well, I apologize for that. I mean, you must have thought about it, right? And when you thought about standing up here and talking to us about this, you didn't think it would be necessary for us to look at it? You didn't think it would be necessary to give opposing counsel a chance to think about and read it and have a meaningful response? I, Your Honor, I apologize. Well, you know what 28J letters are? I'm sorry, Your Honor? Do you know what 28J letters are? I do not, Your Honor. You better find out, because that's the appropriate way to bring these to everybody's attention. Yes, I do, Your Honor. We've done that before, yes. And you decided not to do it in this case, because? My apologies, Your Honor. I didn't see the relevance, because they weren't at the primary issue. At some point you came up with relevance, right? Was it just standing here? At some point before today. Or sitting there when he mentioned it first. Is that when you came up with it? No, Your Honor. Okay. And at that point that you saw, aha, this is something under race, it did not occur to you that you ought to give opposing counsel notice and the court notice of it? Like I said, Your Honor, I apologize. You will never do this again, would you? Absolutely not, Your Honor. Okay. So let's take this off the table right now. Sure. If you want to bring it to our attention, you know how to do it. Sure. The proper way. But before you sit down, I want you to ask about the Cargill letter and the issue that opposing counsel says you have never responded to. So I want to give you a chance to respond to it. Well, I think that's what we were addressing, was that they didn't raise this argument below before the court on noncompliance with the Cargill letter. They didn't allege in their complaint that there was noncompliance with the 2003 letter of enforcement discretion. And it is not relevant to the primary jurisdiction arguments that were asserted below. And under this court's authorities, the Syntax Semiconductor and the Clark v. Time case, this is a situation, because the FDA is currently engaged in rulemaking on this subject, where the primary jurisdiction doctrine should be adopted. Okay. So you're not claiming that you comply with the Cargill letter? Well, this was a 12b-6 issue. I'm asking you a question. I'm not. You're either claiming it or you're not claiming it. And you can tell me why or why not, but you're not claiming that you comply with the Cargill letter. That is not in the record. That is correct, yeah. Okay. Thank you very much. I don't remember if we had any time. We'll give you a ---- I think we had a little time. Yeah, we had a little time. There we go. Good. Thank you. Just briefly, counsel relies on the so-called synonym regulation, 101.13b-4. There's two regulations I think the court should look at. Number one, 101.13c says that if something is stated in the nutrition facts box, it's not a nutrient content claim and vice versa. So it separates those two things. So he starts by saying, well, 101.9 lets us say zero grams in the nutrition facts box. And 101.13b-4 says we can use synonyms. So we can use the synonym for zero here as a nutrient content claim. Well, that's not what 101.13b-4 says. What it says is that you can use synonyms for approved nutrient content claims. And it gives the example of using L-O as a synonym for L-O-W and H-I as a synonym for H-I-G-H for claims where it's authorized, like low cholesterol, high fiber. So that synonym regulation only pertains to authorized nutrient content claims in the first place. The other side made the interesting argument that your client is hoisted on the petard of the complaint by saying he read the entire label. So therefore, he must have known that there was trans fat in it when he bought it. So what's the injury? Right. So that diet tip, the thing is sold in a tub, and that tub is surrounded by a five-sided cardboard packaging. In the complaint, did he say he read the entire label? Right. Well, my point is that the diet tip is on the inside of the packaging. It's not part of what we would call the label. You have to buy the product, go home, and open it and rip the cardboard to see that diet tip. So it's on the inside. So he couldn't have seen it, you know, unless he was ripping, you know, the cardboard. Look at ER-56. Where is that illegible? It's not only tiny. It's green. Not that I have anything against green, but green is more difficult to read than black or some colors. You have it in front of you? Yes, I do. Okay. Just explain to us. There are two strips there. Do I understand you correctly, just to move things along, that the part that has an orange on it is outside of the label and the other strip on the right-hand side that has only green on it is inside? That's correct. If you look on the orange part, there's a rectangular white hole on one of them. I don't mean that. I just want to make sure I understand. So your point is you can't read that part unless and until you buy it and rip it open. Right. And not only that, but I think the argument is precluded by this Court's decision, Williams v. Gerber, where it said that reasonable consumers don't have to turn the thing around and look at the ingredients list and rely on the small print ingredients list. This is the fruit juice? Yes, the fruit juice case, right. Fruit juice. So it said reasonable consumers don't have to rely on the small print ingredients list to correct front label misrepresentations. Now, we did say he read and relied on the label. I don't think we were implying by that necessarily that it was that he read the ingredients list, that he read this diet tip, and he's not required as a reasonable consumer to do that. So I think he certainly has standing on the website. He's not in your position. He's not inquired to rip the label off in the store where someone might get really mad at him. I would say he's probably precluded from doing that by certain laws. And one last thing I wanted to touch on was the idea that the compliance with the minimum contribution requirement wasn't raised below. Even though we may not have specifically addressed that below, the letter only said that you have to continue complying with this aspect of the regulation, and we did say that they didn't comply with the regulation. So I'll just leave it at that. Okay. Thank you. The case is arguably stand submitted. We're adjourned.
judges: KOZINSKI, TROTT, CALLAHAN